(May 31, 1991)

■ THE PEOPLE OF THE STATE OF NEW YORK ex rel. DAVID LAZER, on Behalf of ANTONIO PALMIERI, Appellant, v WARDEN OF NEW YORK COUNTY MEN'S HOUSE OF DETENTION, Respondent. THE PEOPLE OF THE STATE OF NEW YORK ex rel. RORY J. CUTAIA, on Behalf of ROBERTO ESPOSITO, Appellant, v WARDEN OF BROOKLYN CORRECTIONAL FACILITY, Respondent.—Judgments, Supreme Court, New York County (Herbert J. Adlerberg, J.), entered April 4, 1991, denying petitioners' petitions, *ex parte,* for a writ of habeas corpus fixing a reasonable bail, reversed, on the law and on the facts and in the exercise of discretion, without costs or disbursements, the petitions granted and bail set in the case of petitioner Esposito in the sum of $250,000, insurance company bail bond or cash, subject to the following conditions: that he surrender his passport to the court and remain in New York pending disposition of the pending criminal charge (indictment No. 21059-91) and execute a waiver of extradition agreement in a form acceptable to the trial court; in the case of petitioner Palmieri, bail reduced from $150,000 to the sum of $75,000, insurance company bail bond or cash, subject to said petitioner's execution of a waiver of extradition agreement, as aforesaid; in the event petitioners fail to comply with the above conditions, judgments affirmed, without costs or disbursements.

Petitioners have been incarcerated continuously since their arrest on January 31, 1991 on a charge of attempted grand

larceny in the first degree (Penal Law §§ 110.00, 155.42), a class C felony, for their alleged complicity in an attempt to sell certain promissory notes in an amount in excess of $8,000,000, issued by an agency of the Indonesian Government, to an undercover detective. The People allege that the detective was repeatedly assured by petitioners that the notes had, in every past instance, been honored by the Indonesian Government, when, in fact, as they both knew, the notes had never been so honored. After review of all the material submitted to the bail-setting court, we are of the view that petitioner Esposito, presently held in remand without bail, is entitled to bail in the sum indicated as long as the conditions imposed are met. Given the nature of the charge and the range of punishment on conviction, we believe that such a bail is sufficient to assure said petitioner's presence in the jurisdiction for trial. In the case of petitioner Palmieri, who played a lesser role in the negotiations, we believe that a bail, as reduced herein together with the condition attached, is sufficient to assure his return and availability for trial. In so holding, we are not undertaking a *de novo* bail determination *(see, People ex rel. Rosenthal v Wolfson,* 48 NY2d 230) or examining the bail question afresh *(see, People ex rel. Klein v Krueger,* 25 NY2d 497, 501), as the dissent indicated. Rather, we conclude, on the basis of the record which was before the bail-fixing court, that the court's ruling constituted an improvident exercise of discretion. *(See, supra,* at 500-501.)

With respect to the dissent's concerns about petitioners' ties to the PLO and its resources, it should be noted that there is not even a suggestion in the record of any such relationship in the case of petitioner Palmieri. In fact, his resources are such that he cannot make the currently fixed bail of $150,000. The relationship between petitioner Esposito and Hassan Zubaidi, reputedly "a PLO financier and alleged arms dealer", is, in essence, comprehended by the underlying charge and taken into account in the bail set herein and conditions attached. In accordance with the bail criteria set forth in CPL 510.30 (2) (a), it is entitled to no other consideration. We note, in passing, that the clerk's work sheet in connection with the indictment of Hubert Thierry, a French national accused in an earlier indictment of the same crime as is charged here for identical acts, indicates that Thierry was granted bail. In that prosecution, he was alleged by the People to be Zubaidi's attorney, business consultant and "front man." After conviction he was sentenced to five years probation. Nor did anyone else in the case receive a sentence of incarceration. Concur— Murphy, P. J., Sullivan and Carro, JJ.

Asch and Rubin, JJ., dissent in a memorandum by Rubin, J., as follows: As this court has had recent occasion to note, the scope of review upon a habeas corpus petition following a denial of bail "is quite narrow, being limited to a consideration of whether the denial constitutes an abuse of the court's statutory discretion pursuant to CPL 510.30 or a violation of a constitutional standard prohibiting excessive bail or its arbitrary refusal" *(People ex rel. Hunt v Warden,* 161 AD2d 475, 476, *lv denied* 76 NY2d 703). No reason is advanced why Supreme Court's determination with respect to bail should be cast aside, and the majority have undertaken to "examine the bail question afresh" *(People ex rel. Klein v Krueger,* 25 NY2d 497, 501) in contravention of the Court Appeals' stated "disapproval of such a *de novo* determination of bail in collateral proceedings" *(supra,* at 501; *People ex rel. Rosenthal v Wolfson,* 48 NY2d 230). I find no error in the dismissal of the petitions for habeas corpus, and I perceive no abuse of discretion by Supreme Court in denying bail for defendant Roberto Esposito and fixing bail for defendant Antonio Palmieri at $150,000 bond. The court had before it certain relevant facts not recounted in the majority opinion which amply support its determination.

The bonds defendants attempted to sell, issued by Indonesia's National Defense Security Council, have gained notoriety in the financial press, which has reported them to be worthless since 1987. An article appearing in the Far Eastern Economic Review in February, 1987 reported the notes to be "invalid" and linked them to one "Hasan A.F. Zubaidi." He is described as a Palestinian financier who has been involved in fraudulent loan schemes for a decade and whose extradition has been sought by West Germany since 1978 on charges of having defrauded West German companies of about $1.5 million.

A Forbes magazine article of June 15, 1987 provides further details, stating: "Zubaidi is a Palestinian businessman with Jordanian citizenship who has businesses in Beirut and lives in Damascus under the protection of Syrian dictator Hafez al-Assad. According to Colette Avital, a spokeswoman for Israel's Foreign Ministry, Zubaidi provides arms to PLO terrorists and maintains close financial ties with the group." The Forbes article concerns the attempt by one Hubert Thierry, a Marseilles lawyer, to sell $134 million of the bonds to an undercover officer. Thierry was subsequently found guilty of attempted grand larceny. In words which proved prescient, the article concluded: "Police and investors have probably not

heard the last of Hassan Zubaidi. Lieutenant John Kelly [Head of the New York City Police Special Fraud Squad] says authorities believe Zubaidi has control of billions of dollars of similarly worthless Philippine government notes, plus another $3.7 billion of Haitian notes. On May 2, five Europeans were arrested in Manchester, England, for trying to sell $725 million in worthless notes issued by Negros Oriental, a province in the Philippines. The payee named on these notes: Zubaidi Trading Co."

One of the five Europeans arrested in Manchester was defendant Roberto Esposito. The People state, in their opposing affidavit, that the Manchester authorities were unable to prove the invalidity of the Philippine notes, resulting in a verdict of not guilty. However, in addition to copies of the articles appearing in the financial press, the exhibits attached to the pleadings include letters from Dr. Ibnu Hartomo, formerly the Indonesian Deputy for Development of the National Defense Security Counsel and a director of its Welfare Foundation, documenting the fraud surrounding the issuance of the notes at Zubaidi's instigation and stating that they are "null and void at law". Also appended is a fax from Zubaidi to defendant Esposito listing the number and denomination of every Indonesian promissory note in Zubaidi's possession.

The strength of the case against Esposito and his associate, defendant Antonio Palmieri, both Italian nationals, together with their ties to the Palestine Liberation Organization, support Supreme Court's disposition of defendants' bail applications. The State Department, in declining to issue a visa to PLO chairman Yassir Arafat in November, 1988, released a statement citing "convincing evidence that PLO elements have engaged in terrorism against Americans and others" (Washington Post, Nov. 27, 1988, at A34). Given the resources of the PLO, including the sanctuary extended to its operatives by a number of governments, it is naive to conclude that any amount of bail will secure the attendance of defendant Esposito at trial. Even without ties to a known terrorist organization, his reputation in the business community (as reported in the international financial press), his lack of ties to this jurisdiction (in the absence of family, employment or substantial resources in this country), the potential penalty which may be imposed upon conviction (5 to 15 years' imprisonment for attempted grand larceny in the first degree) and the evidence of his complicity in this scheme (CPL 510.30 [2] [a] [i], [ii], [iii], [vii], [viii]), provide ample basis for the sound discretion exercised by Supreme Court in denying bail. While defen-

dant Palmieri's complicity is not so apparent, no reason has been suggested why requiring him to post a $150,000 bond constitutes excessive bail for a man described by defense counsel as a highly successful Italian attorney. Also, irrespective of any similarity between this matter and the prosecution arising out of the attempted sale of Philippine notes, the majority's intimation that Hubert Thierry was released on bail is disputed by the People's affirmation in opposition to the bail application which states that "Hubert Thierry remained incarcerated up to and including the time of his trial."

Requiring surrender of defendant Esposito's passport presents no great obstacle. It was recently reported that Mohammed Rashid, who was arrested in Greece in 1988 in connection with numerous terrorist bombings, was apprehended when the F.B.I. and C.I.A. obtained the numbers of three of his false passports (New York Times Magazine, Capture of a Terrorist, Apr. 21, 1991, at 31, 69).

Finally, requiring defendants to sign extradition agreements does not guarantee their return to New York to stand trial. In 1985, after the hijacking of the ship *Achille Lauro,* the Italian government sent the acknowledged mastermind of the operation, Mohammed Abbas, to Yugoslavia, rather than extradite him to the United States. Then, in a pointless gesture, Abbas was convicted in absentia for his role in the terrorist attack, in which Leon Klinghoffer, a United States citizen confined to a wheelchair, was shot in the head and his body dumped over the side (Livingstone and Halevy, Inside the PLO, at 257-258). The value of an extradition agreement is clearly limited by the willingness of any given foreign government to enforce it.

"Within constitutional limits the nisi prius criminal court has the sole nonreviewable discretion to fix or deny bail" *(People ex rel. Klein v Krueger, supra,* at 502). In the absence of any demonstrated constitutional infirmity or abuse of discretion, the determination of Supreme Court should not be disturbed.

Accordingly, I would affirm the judgments of the Supreme Court in all respects.